IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNNI BRADLEY,<br><br>        Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, CORP. and MERRILL LYNCH, PIERCE, FENNER & SMITH INC.,<br><br>        Defendants. | Case No.<br><br>JURY TRIAL DEMAND |

**COMPLAINT**

Plaintiff Johnni Bradley, by and through his attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendants Bank of America Corporation ("Bank of America") and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch" or "the Firm") (collectively "Defendants").

**JURISDICTION AND VENUE**

1. Plaintiff's claims arise under 42 U.S.C. § 1981. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367. In addition, this Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the Plaintiff and Defendants are citizens of different states and more than $75,000 is in controversy.

2. Venue is proper in this District pursuant to 28 U.S.C. §1391(b). Defendant Merrill Lynch maintains its corporate headquarters and principal place of business in this District and the policies and practices challenged by this lawsuit were issued in this District.

## PARTIES

3.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), is a full-service securities firm and broker-dealer, incorporated in Delaware and headquartered in New York. Merrill Lynch is engaged in the retail and institutional sale of securities, options contracts, and various other financial products. Merrill Lynch is the wholly owned subsidiary of Defendant Bank of America.

4.     Defendant Bank of America is a financial services company incorporated in Delaware and headquartered in North Carolina that provides a variety of banking and investment services. Bank of American acquired Merrill Lynch in or around 2009.

5.     Plaintiff Johnni Bradley is a Black man. He is a citizen of Texas and employed at Merrill Lynch as a Financial Advisor.

## FACTUAL BACKGROUND

### Merrill Lynch's Legacy of Discrimination

6.     Merrill Lynch, one of the nation's largest, most storied, and most profitable financial institutions, has been engaged in an unbroken pattern of systematic race discrimination against its Black employees, including within its Financial Advisor ("FA") ranks.

7.     When Congress passed the 1964 Civil Rights Act, it armed employees with a powerful tool in the fight against race discrimination in the workplace. However, over 60 years later and after decades of litigation achieving significant monetary relief for Black FAs subjected to Merrill Lynch's discrimination, the Firm remains rife with racism and institutional discrimination.

8.     As these years of litigation demonstrate, Merrill Lynch's race-laden culture and dismal retention rates of Black FAs coupled with its centralized teaming and account distribution

policies—which permit white FAs to accumulate lucrative client accounts and hoard the bounties amongst themselves—result in discrimination against Black FAs in terms of treatment, pay, and advancement.

9. This litigation began in 1973, when the EEOC and Helen O'Bannon sought to reform Merrill Lynch's near-total refusal to hire women and Black FAs. *See O'Bannon v. Merrill Lynch*, No. 73-cv-0905 (W.D. Pa.). To resolve this class action, Merrill Lynch entered into a consent decree with the EEOC, agreeing, among other things, to increase the Firm's representation of Black FAs. However, Merrill Lynch never honored its agreement with the EEOC or the mandate of the court and five decades later, Merrill Lynch's percentage representation of Black FAs does not exceed 2 percent.

10. With minimal progress on its hiring goals, Merrill Lynch also persisted in maintaining its centralized policies regarding teaming and account distributions that intentionally rewarded the white men. Further litigation in the 1990's and 2000's continued to challenge these practices.

11. In *McReynolds v. Merrill Lynch*, a class of Black FAs challenged Merrill Lynch's teaming and account distribution policy as intentionally discriminatory against Black FAs by, among other things: (1) distributing lucrative client accounts to FAs based on membership in teams and pools, from which Merrill Lynch knows Black FAs are largely excluded, and (2) relying on factors that have a disparate impact on Black FAs and disproportionately benefit white FAs, including "by prescribing criteria that favor the already successful—those who may owe their success to having been invited to join a successful or promising team." *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012).

3

12. After the Seventh Circuit ordered *McReynolds* to be certified, Merrill Lynch agreed to a landmark settlement of $160 million for Black FAs and programmatic relief.

13. In the years following the *McReynolds* settlement, Merrill Lynch continued to promote teaming. It has maintained its teaming, account distribution, and succession planning practices that Merrill Lynch knows and intends to segregate the work force and allow white men to form teams with white men and distribute accounts from white men to white men to appease the white men who have come to expect the favored treatment.

14. Thus, over 50 years after the EEOC put Merrill Lynch on notice of systemic race discrimination, Black employees remain underrepresented in Merrill Lynch's FA workforce and continue to earn substantially lower wages than their white counterparts and regularly endure discrimination as a result of Merrill Lynch's discriminatory culture, practices, and policies.

**Merrill Lynch Maintains Unlawfully Discriminatory Employment Practices That Harm Black Trainees and FAs Like Bradley**

15. The FAs who work at Merrill Lynch's branch offices across the country advise and service the Firm's clients. Many FAs, including Bradley, begin as trainees in Merrill Lynch's Financial Advisor Development Program ("FADP" or "the training program"). FAs and trainees obtain clients in a number of ways, including through their own efforts, transfers from other FAs, membership in a team (or partnership), the distribution of accounts when an FA retires or leaves the Firm, and the assignment of accounts, leads, referrals, walk-ins, call-ins, and other business opportunities by the Firm.

16. To succeed in the training program, trainees must meet certain hurdles related to bringing in clients and assets into the Firm. Many trainees are placed on established teams of FAs. In fact, in recruiting would-be trainees like Bradley, Merrill Lynch represents and promises that teaming opportunities will allow recruits access to mentoring, assets, and clients, practically

assuring their success. And, for non-Black trainees, this is often the case, as teams readily share access to clients and accounts with non-Black trainees, allowing these trainees to easily meet the training program's hurdles. Frequently, these teams do not value Black trainees' talents or expect Black trainees to succeed in the training program. Unsurprisingly, an internal study concluded that because established FAs believe that Black trainees are likely to fail, the FAs believe mentoring Black trainees is a waste of valuable time, creating a self-fulfilling prophecy. (*McReynolds v. Merrill Lynch*, No. 05-cv-6583, Dkt. 380 at 6 (N.D. Ill. July 24, 2009).) Therefore, teams can treat Black trainees like free temporary labor to gather assets and service client accounts until they fail out of the training program. It is no surprise that discovery in the *McReynolds* lawsuit revealed that Merrill Lynch was 34% more likely to terminate Black trainees than white trainees. (*McReynolds v. Merrill Lynch*, No. 05-cv-6583, Dkt. 471 at 6 (N.D. Ill. July 18, 2011).)

17.    This discovery also revealed that for Black trainees who do become FAs, Merrill Lynch pays them between 33% to 42% less in annual compensation than it paid to white FAs under its uniform, nationwide compensation plans centrally issued every year. (*Id.*) An FA's pay includes a base salary, incentive compensation, and bonuses and awards based on the FA's sales of Merrill Lynch financial products. The bulk of an FA's compensation, however, is incentive compensation, which is largely based on commissions generated from the client accounts that comprise an FA's "book of business." Due to the commission-based and cumulative advantage systems under which FAs are evaluated and compensated, a level playing field and non-discriminatory distribution of resources and business opportunities is essential. Merrill Lynch's policies and practices regarding the distribution of resources and business opportunities result in significant and intentional racial disparities in compensation and attrition.

18. Despite the prior litigation, Merrill Lynch has designed, implemented, and maintained uniform, Firm-wide policies and practices regarding the Firm's FA training program, teaming and pooling of accounts or situational teaming among FAs, and the assignment of business opportunities, resources, and support that intentionally segregate its workforce and discriminate against Black FAs. These policies emanate from its New York headquarters and its Human Resources department located in New York. Merrill Lynch has intentionally designed these policies and practices to maintain historical, discriminatory benefits to white FAs and thereby harm Black FAs, and they achieve these goals.

19. Merrill Lynch uses the practice of FA teams and related policies to avoid an objective and non-discriminatory distribution of client accounts and to steer clients and entire books of business toward white FAs who have historically benefitted from these policies and away from Black FAs. Under Merrill Lynch's teaming and pooling policies and practices, FAs are permitted to form teams with FAs of their choosing and combine their client accounts and books of business. Merrill Lynch encourages and must approve the formation of teams, and is a signatory to teaming and pooling agreements. It also expressly confers special policy advantages, resources, and benefits on teams and FAs on teams, as set forth in the Firm's compensation plans and account distribution and retiring FA policies.

20. In its compensation plans, Merrill Lynch grants higher rates of payout on commissions to FAs on teams. Team members also receive credit for client accounts and production credits they did not generate, and teams and pools steer client assets, production credits, and business opportunities to FAs and FA trainees who would not otherwise receive these assets and opportunities. Merrill Lynch teams are highly segregated by race, and Black FAs are almost entirely excluded from favorable teams and pools and the resources and opportunities

they provide.

21. As explained further below, Bradley was harmed by Merrill Lynch's discriminatory policies and practices, including its teaming and account distribution policies.

**Bradley Excels in Merrill Lynch's Training Program Despite the Firm's Discrimination**

22. After working for Bank of America for three years, Bradley joined Merrill Lynch's training program as part of the August 2016 cohort in the San Antonio office.[1] Despite his strong background and experience with Bank of America, Merrill Lynch questioned his ability to succeed because of his race. For example, a Bank of America branch manager openly doubted to Bradley's peers whether he would make it through the training program because he was a Black man with dreadlocks working in an affluent neighborhood.

23. Bradley's Market Executive initially ignored him, meeting one-on-one with his non-Black peers, but not with him. When Bradley sought out this manager to introduce himself, the manager was startled by Bradley's presence and reacted as if Bradley were going to mug him. Not long after, a fellow Black trainee asked when Bradley was going to cut his hair, but then quickly admitted that management had sent him to ask Bradley about it. The next time the Market Executive saw Bradley, Bradley was with colleagues and was wearing a hat, which covered his hair. Upon seeing Bradley, the Market Executive exclaimed "Johnni, you cut your hair! That's great!," or words to that effect. Bradley had not cut his hair. Shortly thereafter, the Market Executive was promoted.

24. During the training program, Merrill Lynch condoned the poaching of Bradley's clients. For example, Bradley sourced a high-net-worth client. The client inadvertently arrived at the wrong branch for their first meeting, at no fault of Bradley's. Instead of honoring the Firm's

---

[1] Bradley and Defendants entered into a tolling agreement effective February 16, 2022, through August 21, 2025.

non-solicitation policy, and over Bradley's objections, the Firm permitted a non-Black FA to retain this client, who then transferred roughly $20 million to the Firm.

25.    Because Bradley stuck up for himself and complained about this treatment, management labeled him a "troublemaker," a common stereotype for Black individuals who assert their rights.

### Bradley Joins Carl "Triple" Fuhrmann's Team as a Trainee

26.    As a trainee, Bradley joined the team of the late Carl "Triple" Fuhrmann ("Fuhrmann"), a white man. To formalize the teaming arrangement, Bradley, Fuhrmann, and Merrill Lynch executed a Bank Team Financial Advisor Agreement. Bradley was the only Black member of the team, likely in its entire history.

27.    Throughout the training program, the Firm emphasized the difficulty of success absent teaming and encouraged Bradley to join a team. Merrill Lynch promised and represented to Bradley that teaming would provide him access to mentoring and clients. Relying on these promises, Bradley joined the team and invested his time and energy in bringing in assets to split with the team instead of focusing on only developing his own business. As explained below, this reliance was to Bradley's detriment.

28.    Instead of offering Bradley the same terms as the white trainee that had joined the team shortly before Bradley (a 70/30 split in the trainee's favor), the team attempted to pressure Bradley to enter a 30/70 split in the team's favor. Understanding the importance of teams to a trainee's success, Bradley negotiated on his own behalf for a better split, although the team would still not agree to the same terms as it did for the white trainee.

29.    Even after agreeing to this split, the team continually pressured Bradley to accept worse splits for any given client. Moreover, Bradley did not receive any of the benefits of

8

teaming, as the team did not mentor Bradley or share any production credits or assets with him while he was in the training program—he reached all of his hurdles from self-sourced clients.

30. The team's treatment of Bradley is consistent with the Firm's treatment of other non-white trainees, whereby they are treated as unpaid temporary laborers to do the grunt work of gathering assets and servicing client accounts but given no credit or support and expected to fail.

31. That Fuhrmann and his team treated Bradley worse than non-Black FAs should come as no surprise. Unbeknownst to Bradley, Fuhrmann's and his team's history of discrimination against Black employees and other employees of color was well documented and known to the Firm's management. The trainee on the team immediately prior to Bradley was Hispanic. The team openly called this trainee "lazy" and stated that he "never worked," common and harmful stereotypes held about Hispanic individuals, even though the trainee worked hard and successfully completed the training program. After his graduation, the team kicked this trainee off the team but retained his accounts, as it would later attempt to do to Bradley. Offering a stark contrast, when a white trainee joined the team after Bradley, the team provided him with assets, mentoring, and other support. This trainee eventually became an FA and remains on the team to this day, benefiting immensely from his membership.

32. Also unbeknownst to Bradley was the San Antonio office's long-documented history of discrimination. Assuming Black trainees could only work effectively with Black clients, management in the office asked Black trainees whether they could be successful given the relatively small Black population in San Antonio, while at the same time pushing them to only prospect Black clients. Further, over the decades, the few Black trainees employed at the office were denied the mentoring, support, and assets routinely provided to white trainees.

9

33. In fact, the San Antonio office was the epicenter of a class-wide finding of sex discrimination in litigation stemming from *Cremin v. Merrill Lynch*, Case No. 96-cv-3773 (N.D. Ill.). In related proceedings, a manager admitted that he may have told two Black employees to "split up because you are forming a ghetto over there," or words to that effect. He also told another Black employee that "you guys are always lurking in the bushes ready to stab someone," or words to that effect. This manager was later promoted and eventually retired with a very generous payout.

34. Over the years, Fuhrmann's team of white, male FAs benefited immensely from this discriminatory environment built by white men, for white men. Fuhrmann himself found much of his success through membership on a team as a younger advisor and the inheritance of assets from other white men.

35. Bradley is one of the very few successful Black trainees in this history of the San Antonio office. Despite the uphill battle, Bradley excelled. In less than two years, he opened over thirty new client relationships, and he was named FADP Trainee of the Year in both 2018 and 2019. Shortly after his graduation from the training program, the Firm asked Bradley to serve as the training program coordinator.

**Merrill's Discrimination of Bradley Escalates After Bradley Becomes a Financial Advisor**

36. Bradley remained on the team after he graduated as a Financial Advisor ("FA") in 2019. Per the terms of the Bank Team Financial Advisor Agreement between Bradley, the team, and Merrill Lynch, Bradley was entitled to an annual split of 125,000 production credits from the team within one month of his graduation, which would increase his compensation. The team failed to provide this split, and Merrill Lynch never enforced the agreement, despite Bradley

bringing the failure to management's attention. As an FA, Bradley executed additional pooling agreements with the team and Merrill Lynch.

37.    Not only did Merrill Lynch fail to provide Bradley what he was contractually owed, the team's discriminatory treatment continued, including treatment by Fuhrmann, Fuhrmann's team members, and the Client Associates ("CA") on the team. Fuhrmann's team was one of the most lucrative in the office, and management and others were aware of their discriminatory treatment of Bradley.

38.    As just one example, the team openly ridiculed Bradley's hair, telling him that he looked like a criminal or mug shot they saw in the news, or words to that effect. Team members would also compare Bradley to football players, telling him "we see a lot of them have your hair" and ask "did you play football?" or words to that effect, as if all Black men do so. As another example, after George Floyd was murdered, a CA derided the protests and interrogated Bradley about why people were making such a "big deal" out of it. On team meetings, they spoke highly of counterprotests, including those where trucks with confederate flags surrounded racial justice protestors. In another incident, another FA on the team told Bradley that he should take classes so that he talks "a certain way," or words to that effect.

39.    In addition to these discriminatory remarks, the team's discriminatory animus toward Bradley resulted in worse treatment. For example, one CA told a client of Bradley's that the client would not receive the full benefit of the team or the best care if they worked with Bradley. In client meetings, Fuhrmann would treat Bradley as if he were invisible by, for example, introducing the clients to every other member of the team except for Bradley. In one meeting, Fuhrmann played along when one client assumed that Bradley was a cashier that the client had met a few years ago and joked why Bradley as a cashier was sitting next to the

advisors. (The only physical similarity between Bradley and the cashier is that they are both Black men.) Instead of telling the client that Bradley was an advisor, Fuhrmann and team laughed along. Similarly, Fuhrmann derided Bradley, dismissing and demeaning him as "just a banker" and inaccurately claiming Bradley only brought in clients because Bradley was using Fuhrmann's name.

40. These discriminatory actions to steer clients away from Bradley and toward other members of the team lowered his compensation and harmed his professional reputation.

41. Moreover, Fuhrmann relentlessly bullied and harassed Bradley. This treatment came to a head when Fuhrmann attempted to poach Bradley's largest client. Bradley had actively cultivated his relationship with the client since 2018. Over the next several years, Bradley worked diligently to build a strong relationship with the client, often without any help from his team.

42. Bradley was not deterred and, because of his talent and hard work, the client began investing substantial amounts of money with Merrill Lynch. Only after it became clear that Bradley's singular efforts would pay dividends did Fuhrmann become interested in the client. Fuhrmann attempted to strongarm Bradley into moving the client's account to a 70/30 split in the team's favor.

43. When Bradley pushed back, Fuhrmann retaliated, loudly insulting him and threatening to kick Bradley off the team. When Bradley would not change the split, a CA even went to management, falsely reporting that Bradley aggressively yelled at the women CAs on the team, both inaccurate and taking advantage of the harmful stereotype of Black men being a threat to white women.

44. Fuhrmann also ramped up his attempts to poach more of Bradley's clients. For example, after Bradley received a $5 million client in an account distribution, Fuhrmann attempted to schedule a meeting with the client without Bradley. In another attempt to interfere with Bradley's relationship with his clients and degrade him, Fuhrmann planned to send out a team holiday card to Bradley's clients that did not include him in the photo, even though the entire team, including Bradley, took a holiday photo together. It was only because Bradley saw the cards and involved the Division that his clients did not receive the misleading mailings.

### Bradley Complains to Management and the Firm Retaliates

45. In the face of this discrimination and retaliation, Bradley sought help. He reported the discriminatory treatment to Human Resources and management. Rather than support him, management threatened Bradley, telling him that they as managers could set splits however they wanted and that Bradley could leave Merrill, but that his clients would remain the Firm's.

46. Due to the rampant discrimination and harassment, escalating retaliation, and lack of management support, Bradley had no choice but to leave the team. Management continued to retaliate against Bradley. As one example, it assigned many of the clients he self-sourced to the team, even though Bradley was entitled to the clients under the teaming agreement. Only after Bradley spent the Christmas holidays painstakingly documenting his sourcing of the clients did Merrill Lynch relent.

47. Even after Bradley successfully navigated the team dissolution and continued to build his book of business, he faced retaliation from management as he was labeled a troublemaker and targeted for arbitrary discipline. As just one example, the Firm concocted a "policy violation" to sully Bradley's standing within the Firm for non-existent "misconduct." The Firm determined that Bradley failed to log a particular client discussion "within a reasonable

amount of time," even though he had in fact logged the discussion within two business days. For this dreamed-up "violation," the management team (which included managers involved in the team dissolution process) issued Bradley a formal disciplinary reminder, whereas Bradley was aware that management could have and would ordinarily issue an informal verbal warning for actual violations of this policy.

### Merrill's Unlawful Conduct Harms Bradley

48. As a result of Merrill Lynch's unlawful conduct, Bradley has suffered considerable harm and losses. Fuhrmann passed away in 2023. At that time, the team had over $1 billion in assets under management, and had Bradley been on the team at this time, he would have received considerable assets as part of the redistribution of Fuhrmann's accounts back to the team. This is in addition to the assets, increased compensation, and other benefits he would have received had he been a full-fledged member of the team throughout his tenure as an FA, like the white FA who joined the team as a trainee in 2021.

49. In addition to suffering economic losses from being forced from a lucrative team, the discriminatory and retaliatory treatment and lack of management support took a toll on Bradley's physical and mental health. In sum, he has lost wages and other benefits, and suffered irreparable harm to his career, emotional distress, and other non-pecuniary losses. These damages and losses are ongoing. Defendants' unlawful conduct was intentional and in blatant disregard of Bradley's legal and civil rights and warrants the imposition of punitive damages.

### COUNT I

### RACE DISCRIMINATION IN
### VIOLATION OF 42 U.S.C. § 1981

50. Bradley realleges the paragraphs above and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

51.　　42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

52.　　By the acts and conduct described above, Defendants engaged in illegal intentional racial discrimination against Bradley in violation of 42 U.S.C. § 1981.

53.　　Bradley has been harmed as a direct and proximate result of Defendants' unlawful conduct.

## COUNT II

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

54.　　Bradley realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

55.　　Bradley engaged in protected activity by opposing and reporting Defendants' unlawful discriminatory conduct to his managers and Defendants' human resources department.

56.　　Defendants subjected Bradley to additional discrimination and retaliation because he engaged in protected activity, in violation of 42 U.S.C. § 1981.

57.　　Bradley has been harmed as a direct and proximate result of Defendants' unlawful conduct.

## COUNT III

### PROMISSORY ESTOPPEL

58.　　Bradley realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

59. Defendants made specific promises and representations to Bradley regarding the benefits of teaming.

60. It was foreseeable when Defendants made these promises that Bradley would rely on them.

61. Relying on these promises and representations, Bradley joined Fuhrmann's team.

62. Despite Defendants' promises and representations, Bradley was not provided any mentoring or clients or assets of value by the team. By joining the team, Bradley suffered a detriment, forgoing other business opportunities, investing his time and energy in bringing in assets to split with the team instead of focusing on only developing his own business, and enduring racial abuse.

## COUNT IV

## BREACH OF CONTRACT

63. Bradley realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

64. Throughout his employment, Bradley and Merrill Lynch entered into several teaming agreements, including the Bank Team Financial Agreement contract whereby Bradley was owed 125,000 production credits within a month of his graduation from the training program if he remained on the team. Production credits directly contribute to an FA's compensation.

65. Bradley successfully graduated from the training program and remained on the team. Merrill Lynch breached the contract by not providing or facilitating the provision of 125,000 production credits within a month of Bradley's graduation.

66. Additionally, each agreement included an implied covenant of good faith and fair dealing. Merrill Lynch breached the implied covenant of good faith and fair dealing by, among

other things, permitting Bradley to be pressured to change the terms of the agreements, denying Bradley support and mentoring, and subjecting Bradley to discrimination and harassment, as well as other treatment as described herein.

67.  As a direct and proximate result of Defendants' breach of contract, Bradley suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the entry of judgment in their favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful, including that they violate 42 U.S.C. § 1981;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or their reckless or callous indifference to the statutorily protected rights of Plaintiff;

f. Award Plaintiff prejudgment interest;

g. Award Plaintiff attorneys fees, costs, and disbursements; and

h. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: August 22, 2025                                Respectfully Submitted,


                                                     */s/ Jennifer Gilbert*
                                                     *Attorney for the Plaintiff*

Jennifer S. Gilbert
Linda D. Friedman (*pro hac vice* to be requested)
George R. Robot (*pro hac vice* to be requested)
STOWELL & FRIEDMAN, LTD.
303 W. Madison
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
jgilbert@sfltd.com
lfriedman@sfltd.com
grobot@sfltd.com